FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 16, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

CECILIA M.,[1]

                Plaintiff,

v.

ANDREW M. SAUL, the Commissioner
of Social Security,

                Defendant.

No.    4:20-CV-05112-EFS

**ORDER GRANTING PLAINTIFF'S
SUMMARY-JUDGMENT MOTION
AND DENYING DEFENDANT'S
SUMMARY-JUDGMENT MOTION**

Plaintiff Cecilia M. appeals the denial of benefits by the Administrative Law Judge (ALJ). She alleges the ALJ erred by 1) failing to properly consider her endometriosis, adhesions, and urinary disorders at step two of the sequential disability analysis, 2) discounting her symptom reports, and 3) improperly considering the medical opinions of her treating physicians. Plaintiff argues that, as a result, the ALJ reversibly erred by crafting a flawed residual functional

---

[1] To protect the privacy of the social-security Plaintiff, the Court refers to her by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

capacity (RFC) and determining she is not disabled. In contrast, Defendant Commissioner of Social Security asks the Court to affirm the ALJ's decision finding Plaintiff is not disabled. After reviewing the record and relevant authority, the Court grants Plaintiff's Motion for Summary Judgment, ECF No. 15, and denies the Commissioner's Motion for Summary Judgment, ECF No. 16.

## I.   Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[2] Step one assesses whether the claimant is currently engaged in substantial gainful activity.[3] If the claimant is engaged in substantial gainful activity, benefits are denied.[4] If not, the disability evaluation proceeds to step two.[5]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or

---

[2] 20 C.F.R. §§ 404.1520(a), 416.920(a).

[3] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[4] *Id.* §§ 404.1520(b), 416.920(b).

[5] §§ 404.1520(b), 416.920(b).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

mental ability to do basic work activities.[6] If the claimant does not, benefits are denied.[7] If the claimant does, the disability evaluation proceeds to step three.[8]

Step three compares the claimant's impairment or impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[9] If an impairment or combination of impairments meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[10] If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment or combination of impairments prevents the claimant from performing work she performed in the past by determining the claimant's RFC.[11] If the claimant can perform prior work, benefits are denied.[12] If the claimant cannot perform prior work, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national

---

[6] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[7] *Id.* §§ 404.1520(c), 416.920(c).

[8] §§ 404.1520(c), 416.920(c).

[9] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[10] *Id.* §§ 404.1520(d), 416.920(d).

[11] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[12] §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

economy—considering the claimant's RFC, age, education, and work experience.[13] If so, benefits are denied. If not, benefits are granted.[14]

The claimant has the initial burden of establishing she is entitled to disability benefits under steps one through four.[15] At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[16]

## II.    Factual and Procedural Summary

Plaintiff filed Title II and Title XVI applications, alleging in both a disability onset date of February 13, 2014.[17] Her claims were denied initially and upon

---

[13] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497-98 (9th Cir. 1984).

[14] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[15] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[16] *Id.*

[17] AR 234-40, 241-46. At the video hearing, Plaintiff moved to amend her alleged onset date of disability to either July 24, 2017, or September 24, 2018, recognizing that adoption of either date as the alleged onset date would result in abandonment of her claim under Title II. AR 39-42. The ALJ denied the request and considered Plaintiff's claims using an alleged onset date of February 13, 2014. AR 19. On appeal, Plaintiff does not challenge the ALJ's decision to deny amendment of the alleged onset date. *See* ECF No. 15.

reconsideration.[18] An administrative hearing was held by video before

Administrative Law Judge Stewart Stallings.[19]

In denying Plaintiff's disability claims, the ALJ made the following findings:

- Plaintiff met the insured status requirements through September 30, 2015.

- Step one: Plaintiff had not engaged in substantial gainful activity since February 13, 2014, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: lumbar spine degenerative disc disease; polycystic ovarian syndrome with multiple surgeries; and obesity.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations. The claimant can lift/carry less than 10 pounds frequently and 10 pounds occasionally. She can stand/walk about two hours and sit up to eight hours dming an eight-hour workday with normal breaks. The claimant must have a sit/stand option, defined as the option to change between sitting and standing every 30 minutes at her discretion. The claimant can never climb ladders, ropes, or scaffolds. She can occasionally climb

---

[18] AR 105-07, 108-11, 116-18, 119-21.

[19] AR 35-64.

> ramps and stairs, occasionally stoop, rarely crouch (no
> more than 15% of the workday), no kneeling, no crawling.
> The claimant must avoid all exposure to extreme cold,
> extreme heat, extreme wetness, and humidity. She
> cannot have exposure to dangerous or moving machinery,
> exposure to unprotected heights, or drive a motor vehicle.

- Step four: Plaintiff had no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as charge account clerk, phone solicitor, or document preparer.[20]

When assessing the medical-opinion evidence, the ALJ gave great weight to the June 2018 treating opinions of Michael Turner, M.D., and Larry Smith, M.D. (although the ALJ gave little weight to Dr. Smith's August 2018 opinion).[21]

The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.[22]

---

[20] AR 27.

[21] AR 25-26.

[22] AR 23.

1

2

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[23] Plaintiff timely appealed to this Court.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[24] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[25] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[26] Moreover, because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[27] The Court considers the entire record.[28]

---

[23] AR 1-6.

[24] 42 U.S.C. § 405(g).

[25] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[26] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[27] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[28] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383,

1

2

3

4

5

Further, the Court may not reverse an ALJ decision due to a harmless error.[29] An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination."[30] The party appealing the ALJ's decision generally bears the burden of establishing harm.[31]

## IV.    Analysis

6

7

**A.    Step Two (Severe Impairment): Plaintiff fails to establish consequential error.**

8

9

10

11

12

13

14

Plaintiff contends the ALJ erred at step two by failing to identify her endometriosis, adhesions, and urinary disorders as severe impairments. At step two of the sequential process, the ALJ must determine whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits the individual's physical or mental ability to do basic work activities.[32] This involves a two-step process: 1) determining whether a claimant has a medically determinable impairment and 2), if so, determining whether that impairment is severe.[33]

15

16

17

386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

18

19

[29] *Molina*, 674 F.3d at 1111.

20

[30] *Id.* at 1115 (cleaned up).

21

[31] *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

22

[32] 20 C.F.R. §§ 404.1520(c), 416.920(c).

23

[33] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

Impairments "must be established by medical evidence consisting of signs, symptoms, and laboratory findings."[34] If the objective medical evidence demonstrates the claimant has a medically determinable impairment, then the ALJ must determine whether that impairment is "severe."[35] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[36] Likewise, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities, which include the following: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting.[37]

---

[34] 20 C.F.R. §§ 404.908, 416.908 (2010).

[35] *See* Social Security Ruling (SSR) 85-28 at *3.

[36] SSR 85-28 at *3.

[37] 20 C.F.R. §§ 404.921(a), 416.921(a) (2010); SSR 85-28.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

Step two of the sequential disability analysis is "a de minimus screening device [used] to dispose of groundless claims."[38] For that reason, "[g]reat care should be exercised in applying the not severe impairment concept."[39]

Here, the ALJ found Plaintiff had the severe impairments of lumbar spine degenerative disc disease, polycystic ovarian syndrome (PCOS) with multiple surgeries, and obesity.[40] The ALJ additionally found that Plaintiff had inflammatory bowel syndrome and incontinence, but found those impairments were non-severe because the record did not support that they had more than a minimal effect on Plaintiff's ability to perform work-related activities.

The ALJ did not discuss endometriosis, adhesions, or urinary disorders other than incontinence (for example, the ALJ did not discuss overactive bladder). The medical record, however, contains—as Plaintiff notes—objective evidence of these impairments. In March 2016, Dr. Smith diagnosed Plaintiff with endometriosis based on his conclusion that scar tissue from her previous surgeries was not healing properly.[41] Dr. Smith also diagnosed Plaintiff with adhesions, and this

---

[38] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[39] SSR 85-28 at *3.

[40] AR 22.

[41] AR 473.

diagnosis persisted even after Dr. Smith surgically removed some adhesions in February 2014.[42]

Plaintiff's urinary issues are also substantiated by objective medical evidence in the record. Dr. Smith diagnosed Plaintiff with overactive bladder, stress incontinence, and nocturia in February 2017.[43] As early as May 2014, Plaintiff had complained of urinary frequency and the inability to completely empty her bladder.[44] During an internal pelvic floor exam in September 2014, the physical therapist noted Plaintiff had a hypertonic left pelvic floor.[45] In 2017,

---

[42] *See, e.g.*, AR 415 ("Uterine adhesions" diagnosed by Dr. Smith in October 2014), AR 418 (clinic note from Dr. Smith in December 2014 noting adhesions as "possible etiology of [Plaintiff's] pelvic pain"); *see also* AR 23 (ALJ noting laparascopic procedure for adhesions in February 2014).

[43] AR 652.

[44] AR 396.

[45] AR 410. Symptoms of hypertonic pelvic floor include urinary incontinence, incomplete emptying of the bladder, and urinary frequency. *See* AR 404-05 (treating physical therapist noted that Plaintiff reported urgency and inability to completely empty her bladder, and later noted that Plaintiff's subjective symptom reports indicated possible hypertonicity of her pelvic floor); *see also* Faubion, S. S., Shuster, L. T., & Bharucha, A. E. (2012), *Recognition and Management of*

Plaintiff elected to try an "Interstim" device for her bladder issues and pelvic pain, but had the device removed after it fixed her stress incontinence but did not provide her at least 50% reduction in urinary issues and pain and created difficulties with bowel movements.[46]

Because the record contains objective medical evidence of endometriosis, adhesions, and urinary disorders other than incontinence, the ALJ should have discussed these impairments at step two of the disability analysis. Nevertheless, failure to do so is not automatically reversible error. While the ALJ did not address these impairments, he did resolve step two in Plaintiff's favor by finding other medically determinable severe impairments. When an ALJ resolves step two in a claimant's favor by finding a medically determinable severe impairment, any error at step two in failing to find other severe impairments is harmless, although step-two error could be prejudicial at a later step in the sequential disability analysis.[47]

_____

*Nonrelaxing Pelvic Floor Dysfunction*, MAYO CLINIC PROCEEDINGS, 87(2), 187-193, https://doi.org/10.1016/j.mayocp.2011.09.004.

[46] AR 721, 726, 728.

[47] *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006); *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) ("Assuming without deciding that this omission constituted legal error [at step two], it could only have prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Because step two was resolved in Plaintiff's favor, Plaintiff has not established consequential step-two error. Moreover, this Court need not address how the ALJ's step-two error impacted the later steps of the sequential analysis because Plaintiff's case must be remanded for further proceedings and reevalution in any case as explained below.

## B.    Plaintiff's Symptom Reports: Plaintiff establishes consequential error.

Plaintiff argues the ALJ failed to provide valid reasons for rejecting her symptom reports. When examining a claimant's symptom reports, the ALJ must make a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[48] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[49] General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what

---

[48] *Molina*, 674 F.3d at 1112.

[49] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

evidence undermines these claims.[50] "The clear and convincing standard is the most demanding required in Social Security cases."[51] If an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's allegations of pain and other symptoms, the claimant's corresponding limitations must be included in the claimant's RFC.[52]

Factors to be considered in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than

---

[50] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)) (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims).

[51] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[52] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

treatment an individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.[53] The ALJ is instructed to "consider all of the evidence in an individual's record" to "determine how symptoms limit ability to perform work-related activities."[54]

At the video hearing, Plaintiff testified she needs frequent bathroom breaks or she will have accidents—she said she needs to use the restroom 5 or 6 times in an 8-hour period for 5-10 minutes at a time.[55] She also said she needs frequent breaks to lie down when she is in a lot of pain—specifically, she testified she would need to lie down 4 times a day for 30 minutes at a time.[56] The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with her reports to medical treatment providers, improvement with treatment, the objective medical evidence, and her statement that she is "always busy."[57] The ALJ noted the following as specific evidence that Plaintiff's symptoms have not been as significant as she alleged:

---

[53] SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c), 416.929(c).

[54] SSR 16-3p, 2016 WL 1119029, at *2.

[55] AR 49-51.

[56] AR 53-54.

[57] AR 23-24.

- Plaintiff reported some improvement with the medication Lupron, "although her insurance denied coverage of this and she was no longer able to obtain this medication."[58]

- Plaintiff reported some improved symptoms with physical therapy in September 2015, "supporting that her symptoms are not as frequent as alleged."[59]

- Plaintiff reported in November 2015 that she had not achieved any improvement with physical therapy and experienced only mild relief with hydrocodone, but reported in July 2016 that physical therapy was relieving her pain and that her pain only increased when she had steroid injections.[60]

- Plaintiff "reported experiencing good days in October 2016."[61]

- Plaintiff reported in April 2016 that physical therapy was only minimally helpful but reported in November 2016 that physical therapy was helpful, as was a TENS unit and assisted stretching.[62]

---

[58] AR 24.

[59] AR 24.

[60] AR 24.

[61] AR 24.

[62] AR 24.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

- "[E]ven though she reported chronic pelvic pain in April 2016, she acknowledged that she was not in pain at the time of the office visit."[63]

- Although treatment notes indicate Plaintiff reached a plateau in February 2017, Plaintiff reported better pain control throughout 2017 with adjustment in medication.[64]

- Plaintiff reported in March 2017 and January 2018 that physical therapy had been helpful and reported in October 2017 and February 2018 that her pain level was 4 out of 10.[65]

- Plaintiff in January 2018 said her back problems were her main concern but other chart notes from January 2018 indicate that she thought her pelvic pain was a bigger concern than her back pain.[66]

- Plaintiff "reported in May 2018 that she was doing well and continued to benefit from physical therapy, as well as that she drives."[67]

- Plaintiff "reported in September 2015 that she was 'always busy.'"[68]

---

[63] AR 24.

[64] AR 24.

[65] AR 24.

[66] AR 25.

[67] AR 24.

[68] AR 25.

The ALJ also stated that Plaintiff reported some symptoms without objective medical findings. The ALJ noted that Plaintiff reported abdominal pain for 3-4 months in January 2016 for which a colonoscopy showed a small polyp but no explanation for Plaintiff's reported symptoms.[69] The ALJ also noted that Plaintiff reported pelvic pain in March 2016 but an ultrasound did not reveal any abnormalities.[70] The ALJ concluded that, based on these examples, the record "d[id] not consistently document objective evidence to support the claimant's alleged symptoms."[71] The ALJ did, however, recognize that the record contained objective findings to support "some" of Plaintiff's reported symptoms, which the ALJ said were accounted for in the RFC.[72]

First, as to the ALJ's finding that Plaintiff's symptom reports were inconsistent with her symptom improvement,[73] the Court is mindful that

---

[69] AR 24.

[70] AR 24.

[71] AR 24.

[72] AR 24-25.

[73] The effectiveness of treatment is a relevant factor in determining the severity of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.913(c)(3); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 18

"treatment records must be viewed in light of the overall diagnostic record."[74]

Neither this Court nor the ALJ may cherry pick evidence to support a conclusion

that contradicts the overall diagnostic record.[75] Here, however, the ALJ selectively

evaluated the record by picking out small snapshots and extrapolating those

snapshots beyond their context. For example, the ALJ noted that Plaintiff was not

in pain at an April 2016 office visit, had both good and bad days in September

2015, and reported having "good days" in October 2016.[76] The ALJ said these facts

supported that Plaintiff's symptoms were not as significant as she alleged.[77] Not

experiencing pain during a single office visit, however, is not incompatible with

chronic pain and is not a clear and convincing reason to reject Plaintiff's symptom

reports.[78] Nor is having a few "good days" over the course of consistent treatment:

> [I]t is error to reject a claimant's testimony merely because symptoms
> wax and wane in the course of treatment. Cycles of improvement and
> debilitating symptoms are a common occurrence, and in such
> circumstances it is error for an ALJ to pick out a few isolated

---

[74] *Ghanim*, 763 F.3d at 1164.

[75] *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (cleaned up) ("Although it

is within the power of the Secretary to make findings concerning the credibility of a

witness …, he cannot reach a conclusion first, and then attempt to justify it by

ignoring competent evidence in the record that suggests an opposite result.").

[76] AR 24.

[77] AR 24.

[78] *See Garrison*, 759 F.3d at 1017.

instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.[79]

Furthermore, the "good day" Plaintiff noted in October 2016 was not a painfree day. Indeed, treatment notes from Dr. Gloria from that day provide that: "Patient states that she is having a good day with pain level at a 5."[80] At that visit, Plaintiff noted abdominal pain, myalgias, back pain, and dizziness.[81] In other words, a "good day" for Plaintiff is a relative term that is consistent with her reports of chronic and significant pain. The existence of a few "good days" over the course of consistent treatment does not provide a clear and convincing reason to discount Plaintiff's symptom testimony.

Discounting Plaintiff's symptom testimony is also not appropriate on the basis that Plaintiff had some improvement with the medication Lupron and experienced a benefit from a TENS device. As for the Lupron medication, the ALJ himself noted that Plaintiff's insurance no longer covered the medication and she

---

[79] *Id.* (discussing mental health issues); *see also Guerra v. Berryhill*, 448 F. Supp. 3d 1115, 1125 (D. Nev. 2020) ("While *Garrison* concerned mental health symptoms specifically, the Court finds the reasoning easily applicable here in the context of chronic pain.").

[80] AR 620.

[81] AR 620.

was no longer able to access it.[82] Therefore, any improvement she may have experienced in the past (which she said was only slight[83]) is not a valid basis upon which to discredit her symptom testimony because "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds."[84] Likewise, the ALJ noted Plaintiff had experienced some benefit from a TENS unit—the ALJ failed to note, however, that Plaintiff could not afford her own personal TENS unit and was only able to use the unit available to her during physical therapy.[85] Any benefit from a TENS unit, therefore, is also not a valid basis upon which to discredit Plaintiff's testimony.[86]

As for improvement with physical therapy, the ALJ correctly noted that Plaintiff reported some improvement with physical therapy. For instance, Plaintiff reported some improvement in September 2015 ("mild improvement with manual techniques"[87]), November 2016 ("still struggling with some sacroiliac pain, though

---

[82] AR 24.

[83] AR 443 (Lupron "decreased her pain slightly").

[84] *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995).

[85] AR 583 ("Discussed again the importance and role of a TENS unit; she is somewhat interested but she does not have the financial means at the present time").

[86] *Gamble*, 68 F.3d at 321.

[87] AR 447.

she has noted improvement going to physical therapy at [clinic] twice a week"[88]),

March 2017 ("She has had declining functional status lately. Physical therapy was

helpful but she has finished."[89]), January 2018 ("Doing somewhat better. 75

percent of her problem is back pain; 25 percent she feels like comes from her

ovaries. … Continue aqua therapy at [therapy location], once weekly."[90]), and May

2018 ("Doing decently well since I saw her last time. Continues with benefit from

physical therapy … Still requires hydrocodone-typically one pill 4 times daily."[91]).

But these visits must be viewed in the context of the entire record. The overall

record reveals the benefits Plaintiff experienced from physical therapy were

variable and short-lived, lasting at most a few months.[92] For example, in January

2016, Plaintiff reported to Dr. Gloria that she had gradually worsening pain in her

lumbar spine that she described as aching, shooting, and stabbing—she rated the

---

[88] AR 576.

[89] AR 583.

[90] AR 594.

[91] AR 821.

[92] *See Garrison*, 759 F.3d at 1015 ("Garrison's medical records show that physical

therapy afforded her only partial and short-lived relief of her lower back pain, and

no effective relief for her radiating neck pain. … [E]pidural shots … relieved

Garrison's back pain for only variable, brief periods of time, ranging from a couple

of months to a few days.").

pain 8/10 and called it "severe."[93] She also reported lower left quadrant pain that she described as "moderate."[94] In March of 2016, Plaintiff was still experiencing abdominal pain and Dr. Smith informed her that her symptoms were consistent with endometriosis, which could be causing her pain.[95] Dr. Smith noted specifically that "[s]everal treatment options have been tried and failed including medical management, PT, Lupron injections."[96] Dr. Smith started Plaintiff on an additional medication, gabapentrin, for her pain.[97] The gabapentrin did not provide relief for long.[98] Also in March 2016, Plaintiff's abdominal pain was "excruciating" and she went to the emergency department to be seen.[99] A CT scan did not find any abnormalities, but the emergency physician recommended discussing a hysterectomy.[100] Plaintiff followed up with a gynecologist; the gynecologist,

---

[93] AR 467.

[94] AR 467.

[95] AR 473.

[96] AR 473.

[97] AR 473.

[98] Compare AR 485 (note from 04/05/2016 that gabapentrin provided "some relief") with AR 487 (note from 05/29/2016 that low dose of gabapentrin providing "no relief").

[99] AR 474.

[100] AR 478.

however, did not recommend a hysterectomy, fearing that, because of the "multifactorial" nature of Plaintiff's pain (including abdominal adhesions from multiple previous surgeries and probable endometriosis), a hysterectomy could increase her pain rather than decrease it.[101] The gynecologist recommended a long-term and potentially lifelong pain management program that incorporated a multidisciplinary approach with the goal of "improving her pain enough so that she is able to achieve normal everyday function."[102] In July 2016, Plaintiff reported that her low back pain was worsening and intolerable, sometimes reaching 10/10,[103] and was so severe that she "cannot function and complete every day tasks."[104] She continued to report severe pain at various appointments throughout 2016.[105]

---

[101] AR 521.

[102] AR 521-22.

[103] AR 531.

[104] AR 534.

[105] *See, e.g.*, AR 560 (August 11, 2016, reporting "Needles, shooting pain" at 8 to 9/10 on pain scale), AR 564 (August 25, 2016, Dr. Turner notes "significant back pain with radiation to the left thigh and left groin" and diagnosing probable left L4 radiculopathy), AR 566 (October 24, 2016, reporting left hip and lower back pain at 7 to 8/10 on pain scale), AR 569 (November 2, 2016, noting stabbing, shooting, burning back and hip pain at 10/10 on pain scale; Dr. Turner noted likely nerve

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Plaintiff also reported severe pain throughout 2017. In April 2017, Dr. Gloria increased Plaintiff's pain medications because her regimen was no longer controlling her pain.[106] After that, Plaintiff infrequently noted some improvement.[107] The ALJ concluded Plaintiff had better pain control throughout 2017, and included this fact in his discussion of why Plaintiff's symptoms were not as significant as she alleged.[108] However, Plaintiff continued to report pain

---

root compression), AR 572-73 (October 16, 2016, lower back pain at 5 to 9/10 on pain scale, physical therapy had been helping some), AR 575 (November 13, 2016, reporting sharp, shooting lower back pain at 9/10 on pain scale occurring at night when she is relaxed).

[106] AR 629-30.

[107] *See, e.g.*, AR 583 (March 14, 2017, Dr. Turner wrote "Physical therapy was helpful but she has finished."), AR 589 (August 30, 2017, Dr. Turner wrote "Previous lidocaine injection causes significant postprocedural pain flare for about a week, then she got better, then she got worse.").

[108] AR 24.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 25

throughout 2017, to both Dr. Turner[109] and Dr. Smith.[110] In February 2017, Dr. Turner called Plaintiff's case a "[d]ifficult case," writing that "[s]he has plateaued i.e. she has not improved at all since last time I saw her – this despite consistency with her home exercise program and participation in physical therapy" and noted she was "[s]till having constant pain."[111] At that point, Dr. Turner favored surgical intervention.[112] In August 2017, Plaintiff received sacroiliac ligament injections for her back pain.[113] Plaintiff's pelvic pain also continued throughout 2017.[114]

---

[109] *See, e.g.*, AR 798 (On February 2, 2017, Plaintiff noted her back pain was aching and stabbing and was a 7/10; Dr. Turner noted she "[a]ppear[ed] very uncomfortable."), AR 589 (August 30, 2017, Dr. Turner says "She mentions constant pain in the back and sacral joints that is typically worse with activity.").

[110] *See, e.g.*, AR 651, 658.

[111] AR 799.

[112] AR 799.

[113] AR 658.

[114] *See, e.g.*, AR 651 (February 2017, Dr. Smith notes that Plainff "Reports pelvic pain. She has continued PT and notes no improvement."), AR 630 (April 6, 2017, Dr. Gloria notes "Chronic pelvic and sacroiliac pain" and that Plaintiff needed an increase in pain medication.), AR 632 (July 2017, Dr. Gloria's treatment notes state Plaintiff's pain at 7/10 without medication but 4/10 with medication.), AR 658

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

　　　In January 2018, Plaintiff reported that pelvic floor therapy was helping, but she continued to have pelvic pain and back pain and she felt she was "in a rut."[115] She expressed to Dr. Smith that she was "frustrated with the pain in her pelvis/abdomen."[116] Dr. Smith gave her information on the Interstim device, "with the hope that this will address both pelvic and back pain."[117] Plaintiff elected to have the Interstim device surgically implanted in July 2018, although she later had it removed because she was still experiencing 8/10 pain and could not have a bowel movement with the device on.[118] In October 2018, an ovarian cyst, endometrial calcifications, and a few small endometrial cysts were discovered.[119] Also in October 2018, an MRI showed a lumbar disc protrusion causing possible compression of the left S1 nerve root.[120] Plaintiff continued to seek treatment for

---

(Plaintiff visited Dr. Smith on August 21, 2017, to follow up on her pelvic pain, which she said had not improved.), AR 635 (October 2017, Dr. Gloria's treatment notes state Plaintiff's pain level at 4/10 with current medications.).

[115] AR 661 (Dr. Smith treatment note from January 26, 2018).

[116] AR 662.

[117] AR 662.

[118] AR 721 (Interstim implantation procedure), AR 724 (8/10 pain even after Interstim implanted, unable to have bowel movements), AR 728 (device removed).

[119] AR 785.

[120] AR 851.

her pain throughout January 2019.[121] In January 2019, Plaintiff began a new medication for her endometriosis pain. At that point, the medical record ends.

In short, Plaintiff's symptoms occasionally improved, but the overall diagnostic record is full of objective clinical findings that support her allegations of severe and chronic pain.[122] Nowhere has the ALJ pointed to affirmative evidence of malingering, and none of Plaintiff's physicians found that she was exaggerating her pain or that she was not credible.[123] In fact, in a treatment note from June 2018, Dr. Turner lamented that Plaintiff had serious adverse reactions to certain targeted steroid injections, stating that "[t]he lack of this treatment option has caused her therapy to be slow and to suffer frequent setbacks."[124]

---

[121] AR 868-69 (Plaintiff seen for endometriosis and chronic pain; treating physician prescribed medication for endometriosis).

[122] *See Gallant*, 753 F.2d at 1455 ("[T]he record is replete with objective clinical findings which support and confirm claimant's allegations of severe and chronic pain. There was no positive evidence that claimant was not suffering as much pain as he claimed to suffer.").

[123] Furthermore, Plaintiff consistently explained that she is unable to engage in physical activity without pain and requires her mother's help to care for her children. AR 45, 519, 579.

[124] AR 830. In 2015, Plaintiff had injections into her bilateral lower abdomen, but a week later presented to the emergency department reporting severe pain in her

In light of the lengthy medical record that documents Plaintiff's longstanding complaints of severe pain and contains corresponding objective medical findings (cysts, adhesions, lumbar disc protrusion, nerve compression, etc.), the ALJ did not have a clear and convincing reason to reject Plaintiff's symptom testimony based on occasional improvement or brief periods of mild relief.[125]

Furthermore, the ALJ determined Plaintiff gave "inconsistent" reports by noting when she experienced some improvement, but this is not a reasonable finding supported by substantial evidence. As noted above, "[c]ycles of improvement and debilitating symptoms are a common occurrence."[126] That

---

abdomen ever since the injection. AR 452. In July 2016, Plaintiff had steroid injections for her pelvic pain, but reported to Dr. Smith a few days later that she had been in severe pain since the injections. AR 533. Plaintiff received a non-corticosteroid sacroiliac injection in August 2018, but reported little relief. AR 561.

[125] *See Trevizo v. Berryhill*, 871 F.3d 664, 680 (9th Cir. 2017) ("The ALJ found Trevizo's claims of fatigue to be contradicted by the treatment notes because the notes 'generally show denials of fatigue.' Yet it is not inconsistent with disability that Trevizo was not entirely incapacitated by fatigue at all times, and the treatment notes reflect that Trevizo reported weakness or fatigue at more than half of her appointments with Dr. Galhotra.") (cleaned up).

[126] *Garrison*, 759 F.3d at 1017; *see also Guerra*, 448 F. Supp. 3d at 1125.

Plaintiff reported no improvement in November 2015 and then some improvement in July 2016 is not a true "inconsistency" and is not a clear and convincing reason to reject her testimony.[127] Likewise, the ALJ faulted Plaintiff for stating on January 3, 2018, that most of her problem was back pain[128] but stating on January 26, 2018, that the pain in her pelvis and abdomen was a bigger concern than her back pain "at this time."[129] Calling these reports "inconsistent" is not a reasonable conclusion. More than three weeks separate the reports and, in that span of time, Plaintiff's pain levels related to her back and pelvis may have fluctuated. That Plaintiff's back hurt more in the beginning of January 2018 but her pelvis hurt more at the end of January 2018 is not a valid basis upon which to discount her testimony that she experiences chronic pain and needs to take 30 minute breaks to lie down throughout the day.

---

[127] Indeed, Plaintiff is correct that honest reporting about when she is experiencing relief is to her credit. *See Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998) ("Claimant periodically advised her doctors when she was feeling somewhat better. This is unlikely behavior for a person intent on overstating the severity of her ailments.").

[128] AR 594 ("75 percent of her problem is back pain; 25 percent she feels like comes from her ovaries. Back pain is typically worse with weather or staying still for too long.").

[129] AR 662.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The ALJ also did not have a valid reason to reject Plaintiff's testimony based on a statement that she was "always busy." The ALJ said Plaintiff was not more limited than as set forth in the RFC, stating, "[n]otably, the claimant reported in September 2015 that she was 'always busy.'"[130] The ALJ failed to mention, however, that Plaintiff made this statement to explain why she was late to a physical therapy appointment. Furthermore, Plaintiff had not said what she was busy doing. Without more, Plaintiff's statement is not clear and convincing evidence that supports discounting her testimony.[131]

The ALJ also said that some of Plaintiff's symptoms lacked objective findings. The ALJ pointed to abdominal pain that Plaintiff reported in January 2016 and pelvic pain that Plaintiff reported in March 2016, noting that the colonoscopy and ultrasound conducted for those respective problems did not reveal any abnormalities. However, "once a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate

---

[130] AR 25.

[131] *See Trevizo*, 871 F.3d at 682 (although claimant engaged in child-care activity, nothing in the claimant's records revealed "an adequately specific conflict with her reported limitations.").

the alleged severity of pain."[132] That is not to say the lack of objective medical

evidence has no value—objective medical evidence is a relevant factor in

considering the severity of the reported symptoms.[133] Here, however, because none

of the other reasons provided by the ALJ are valid reasons to reject Plaintiff's

symptom testimony, the lack of objective medical evidence cannot stand alone as a

reason to reject the testimony.[134] On a more fundamental level, the ALJ reached a

---

[132] *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir.1991) (en banc); *see also Rollins*

*v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

[133] Objective medical evidence means signs, laboratory findings, or both. 20 C.F.R.

§§ 404.1502(f), 416.902(k). In turn, "signs" is defined as:

> one or more anatomical, physiological, or psychological abnormalities
> that can be observed, apart from [the claimant's] statements
> (symptoms). Signs must be shown by medically clinical diagnostic
> techniques.

*Id.* §§ 404.1502(g), 416.902(l). Evidence obtained from the "application of a

medically acceptable clinical diagnostic technique, such as evidence of reduced joint

motion, muscle spasm, sensory deficits, or motor disruption" is considered objective

medical evidence. 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective

medical evidence (2019).

[134] 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence

(2019). Notably, after stating that the medical record lacked objective findings for

some of Plaintiff's complaints, the ALJ acknowledged that the medical record also

questionable conclusion in determining there was no objective medical evidence for the abdominal and pelvic pain Plaintiff reported in January and March 2016. As the ALJ himself noted, Dr. Smith suspected that abdominal scar tissue was the cause of Plaintiff's abdominal and pelvic pain, which he said was consistent with endometriosis.[135] Scar tissue is an observable physiological abnormality and, therefore, is a "sign" that would constitute objective medical evidence.[136]

For the reasons explained above, the ALJ did not have clear and convincing reasons (whether the proferred reasons are viewed independently or in the

---

contained evidence to support "some" of Plaintiff's symptoms, including some abdomen pain and low back pain that flares. The ALJ cited the following: an October 2015 CT scan showing bilateral hydronephrosis and sacroiliitis; a November 2015 CT scan showing sacroiliitis and possible inflammatory bowel disease; an August 2016 MRI showing sacroiliitis of Plaintiff's hips; MRI imaging in October 2016 revealing bilateral sacroiliac arthralgia and probable left L4 radiculopathy; and MRI imaging from November 2016 showing a disc protrusion at L5-S1 with probable compression of the S1 nerve root.

[135] Dr. Smith diagnosed Plaintiff with endometriosis during the March 2016 visit cited by the ALJ, stating that Plaintiff's "symptoms are consistent with Endometriosis and PCOS. Due to multiple surgeries the [patient] was informed that her scar tissue may not be healing well causing the pain." AR 473.

[136] 20 C.F.R. §§ 404.1502(g), 416.902(l).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

aggregate) to reject Plaintiff's testimony about the intensity, persistence, or limiting effect of her pain. The ALJ, therefore, erred in rejecting Plaintiff's symptom testimony. This error was not inconsequential. Plaintiff testified that she needed four 30-minute breaks a day due to her pain, amounting to 2 hours out of an 8-hour workday. The vocational expert testified that a worker who would have a reduction in productivity greater than 20% due to additional breaks would not retain competitive employment for long.[137] Therefore, had the ALJ credited Plaintiff's testimony about her pain and her need for breaks, Plaintiff would have been determined disabled.[138] As explained below, on remand, the ALJ is instructed

---

[137] AR 59.

[138] The Commissioner argues the ALJ had a clear and convincing reason to reject Plaintiff's testimony that she needed to lie down 4 times a day for 30 minutes each time because Plaintiff sometimes told her providers that it hurt more to be still and sometimes told her providers that it hurt more to walk around and move. The ALJ did not cite this as a reason to reject Plaintiff's testimony, and this Court can only review the reasons cited by the ALJ. *See Garrison*, 759 F.3d at 1010. The Commissioner is correct that in July 2016 Plaintiff reported that her back pain was typically worse with activity and better with sitting. AR 558. But that same treatment note said, "Overall, the problem is worsening and intolerable, significantly affecting all aspects of her life." AR 558. The Commissioner is also correct that in August 2016, Plaintiff said her back pain was worse with sitting or

to credit Plaintiff's testimony unless the ALJ can articulate specific reasons to discount Plaintiff's testimony. If the ALJ rejects Plaintiff's testimony, the ALJ must be specific about which testimony is being rejected (i.e. back pain, pelvic pain, etc.), and the ALJ must cite to specific evidence in the record to explain why each type of testimony is being rejected. The ALJ's reasons for rejecting the testimony must be clear and convincing.

With respect to Plaintiff's testimony regarding urinary issues and her need for 5-6 bathroom breaks in an 8-hour period, the ALJ failed entirely to discuss why this testimony was rejected. The ALJ simply "acknowledge[d] that the claimant underwent surgery to install an InterStim device for her overactive bladder and chronic pelvic pain in July 2018" and that the device was later removed.[139] The ALJ stated that it had accommodated this circumstance by "limiting the claimant

being stationary. AR 564. And Plaintiff also reported in January 2018 that her pain was typically worse with staying still for too long. AR 594. In August 2018, Plaintiff reported her back pain was "typically worse with activity." AR 589. Even had the ALJ cited them, these reports are not a valid reason to reject Plaintiff's testimony that she needs to lie down. Indeed, these notes demonstrate only that Plaintiff was in pain both when she was sitting and when she was more mobile. Which activity hurt more during a particular time period does not negate that both caused Plaintiff pain.

[139] AR 25.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

to a 'sedentary' exertional level with lifting/carrying no more than 10 pounds."[140] This is not sufficient to explain why Plaintiff's testimony about her need for bathroom breaks was rejected. On remand, if the ALJ discounts Plaintiff's symptom reports regarding her urinary issues and need for frequent bathroom breaks, the ALJ must meaningfully articulate specific, clear, and convincing reasons for doing so with citation to supporting evidence.

**C.     Medical Opinions: The ALJ must reevaluate.**

Plaintiff challenges the ALJ's assignment of little weight to the following: the medical questionnaire opinion filled out by Dr. Smith in August 2018 in which Dr. Smith opined that Plaintiff could not do any work (an opinion based on the functional capacity evaluation (FCE) performed by physical therapist Mark Johnson); and the opinion of Dr. Gloria that Plaintiff was "unable to work due to her pain and will be applying for disability."[141] Plaintiff also challenges the ALJ's assignment of great weight to the June 2018 opinions of Dr. Smith and Dr. Turner that Plaintiff could perform sedentary work.

As discussed above, remand is required on other grounds. However, on remand, the ALJ should also reevaluate the medical opinions, as explained more fully below.

---

[140] AR 25.

[141] ECF No. 15.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

 1. <u>Standard for Claims Filed Before March 27, 2017</u>

 The weighing of medical opinions is dependent upon the nature of the medical relationship, i.e. whether the provider is 1) a treating physician, 2) an examining physician who examines but did not treat the claimant, or 3) a reviewing physician who neither treated nor examined the claimant.[142] Generally, more weight is given to the opinion of a treating physician than to an examining physician's opinion and both treating and examining opinions should be given more weight than the opinion of a reviewing physician.[143]

 When a treating physician's or evaluating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and when it is contradicted, it may be rejected for "specific and legitimate reasons" supported by substantial evidence.[144] A reviewing physician's opinion may be rejected for specific and legitimate reasons supported by substantial evidence, and the opinion of an "other" medical source[145] may be

---

[142] *Garrison*, 759 F.3d at 1012.

[143] *Id.*; *Lester*, 81 F.3d at 830-31.

[144] *Lester*, 81 F.3d at 830.

[145] *See* 20 C.F.R. § 404.1502 (For claims filed before March 27, 2017, acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, licensed advanced practice registered nurses, and licensed physician

rejected for specific and germane reasons supported by substantial evidence.[146] The opinion of a reviewing physician serves as substantial evidence if it is supported by other independent evidence in the record.[147]

### 2. Larry Smith, M.D., August 2018 Opinion

In June 2018, Dr. Smith submitted a medical questionnaire opining that Plaintiff could perform sedentary work. However, in August 2018, after physical therapist Mark Johnson performed a functional capacity evaluation (FCE) of Plaintiff, Dr. Smith submitted another medical questionnaire opining that Plaintiff could not perform any type of work on a reasonably continuous, sustained basis. During the August 2018 FCE, Plaintiff completed 4 of the 15 subtests. She reported to Mr. Johnson that she could not complete the remainder of the FCE because of the severity of her lower back pain.[148] In his report, Mr. Johnson stated that "Objective signs coincided with the client's reports of discomfort including increased heart rate, posturing, and weight-shifting."[149] Under a "Limitations" subheading, Mr. Johnson wrote the following:

---

assistants within their scope of practice—all other medical providers are "other" medical sources.).

[146] *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

[147] *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

[148] AR 738.

[149] AR 738.

- Antalgic gait pattern

- Slight to significant limitations with spine and extremity AROM

- Slight to significant limitations with extremity strength

- Limited endurance and tolerance for repetitive R heel raises and B knee squats

- Significantly below average B grip strength scores

- Below average B fine motor skills test scores

- Limited tolerance for prolonged seated work tasks

- Inability to accurately assess abilities and limitations with the following subtests: prolonged walking, waist-to-floor lift, waist-to-crown lift, front carry, statis push and pull, elevated work with weight, forward bending while standing, prolonged standing work, crouching, kneeling and half-kneeling, and stair climbing.[150]

The ALJ mistakenly stated that Dr. Smith had performed the FCE. In any case, the ALJ discounted Dr. Smith's most recent opinion that Plaintiff could not do any work because that opinion was based on the FCE,[151] which the ALJ discounted because 1) the FCE was incomplete and 2) Plaintiff "demonstrated inconsistent limitation of lumbar range of motion and reaching with her upper extremities

---

[150] AR 738.

[151] AR 26.

during testing."[152] The ALJ concluded that, "[t]herefore, the basis for Dr. Smith's change in opinion lacks objective/clinical findings and even suggests inconsistency in the claimant."[153]

Dr. Smith's August 2018 opinion is uncontradicted. This is because he is the only physician whose opinion incorporated the findings of the August 2018 FCE performed by physical therapist Johnson. While Dr. Turner in June 2018 opined that Plaintiff could perform sedentary work, the FCE had not yet been completed. For that reason, even though Dr. Turner's opinion differs from the later opinion of Dr. Smith, "[t]he case is thus not one of conflicting medical viewpoints but one in which differing opinons are not drawn from the same facts."[154] Because Dr. Smith's FCE-based opinion is uncontradicted, the ALJ must have articulated clear and convincing reasons to properly reject it in favor of the earlier opinions of Dr. Smith and Dr. Turner.

The first reason offered by the ALJ is that the FCE upon which Dr. Smith's opinion was based "[wa]s incomplete."[155] Stating only that the FCE was incomplete, however, ignores *why* it was incomplete: Plaintiff was in too much pain

---

[152] AR 26.

[153] AR 26.

[154] *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987) (quoting *Beecher v. Heckler*, 756 F.2d 693, 695 (9th Cir. 1985)) (cleaned up).

[155] AR 26.

to continue the assessment. Notably, nothing in the record indicates that Plaintiff was feigning pain. Nor is this a case in which Plaintiff simply refused to perform the testing because she did not want to. Rather, Plaintiff attempted to perform the testing, and she completed 4 out of 15 subtests before the pain became too intense to continue. Her pain was corroborated by an increase in her heart rate and also by the observations of physical therapist Johnson that she was posturing and weight shifting.[156] Because the FCE was terminated due to Plaintiff's complaints of severe pain, and because nothing casts doubt on the credibility of those complaints, the early termination of the FCE is not a clear and convincing reason to reject Dr. Smith's opinion.

The ALJ secondarily noted that, during the FCE, Plaintiff "demonstrated inconsistent limitation of lumbar range of motion and reaching with her upper extremities during testing."[157] The ALJ's remark refers to the following note by physical therapist Johnson:

| Coordination | Standard Score | Rating | Limitations | Recommendations |
|---|---|---|---|---|
| FCE Board - Round Blocks Dominant Hand | 40 | Low | The client demonstrated inconsistent limitation of lumbar rotation ROM and reach with the UE's when performing this task. She would limit the extent to which she would rotate to one side and reach when flipping the blocks on one trial but then not on another, this occurred with both the dominant and non dominant hands. | |

---

[156] AR 738.

[157] AR 26.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

This is the only task for which Mr. Johnson noted any inconsistency. This is notable because Mr. Johnson's report does not itself explain how the single inconsistency in the PCE Board Round Blocks task impacted other significant conclusions in the FCE analysis, if at all. For example, in the comments section under "Quality of Motion – Spine," Mr. Johnson wrote: "Slightly limited AROM with cervical spine R rotation. Significantly limited AROM with lumbar spine flexion, extension, B lateral flexion, and B rotation." Mr. Johnson made no mention in this section of the PCE Board Round Blocks task. It is not clear, therefore, that the inconsistency noted in the PCE Board Round Blocks task had any impact on Mr. Johnson's assessment of Plaintiff's "significant" limitation in lumbar spine flexion, extension, B lateral flexion, and B rotation. Moreover, because the single inconsistency noted in the PCE Board Round Blocks task involved Plaintiff's upper extremities, that inconsistency would seemingly have no import on the following limitations assessed by the physical therapist:

- Antalgic gait pattern
- Limited endurance and tolerance for repetitive R heel raises and B knee squats
- Limited tolerance for prolonged seated work tasks

In any case, it is unclear to what extent the ALJ relied on the inconsistency in the PCE Board Round Blocks task when rejecting the FCE and, consequently, Dr. Smith's August 2018 opinion. The ALJ wrote only that "the basis for Dr. Smith's change in opinion lacks objective/clinical findings and even suggests

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 42

inconsistency in the claimant."[158] The primary reason the ALJ rejected the later FCE-based opinion, therefore, was because it "lack[ed] objective/clinical findings" because it was incomplete. The ALJ's notation that the FCE "even suggests inconsistency" does not provide a clear indication that the ALJ intended the noted inconsistency to serve as an independent basis upon which to reject the entire FCE-based opinion.

Because the incompleteness of the FCE is not a proper basis to reject the FCE-based opinion in these cirumstances, and because the Court cannot be certain the ALJ relied on another independent reason to reject the FCE-based opinion, the Court must conclude the ALJ failed to articulate specific, clear, and convincing reasons to reject Dr. Smith's FCE-based opinion.

On remand, if the ALJ again rejects Dr. Smith's August 2018 opinion due to the FCE upon which it is based, the ALJ should make clear the basis for that decision.

3.    <u>Dr. Smith and Dr. Turner's June 2018 Opinions</u>

The ALJ gave great weight to the earlier opinions of Dr. Smith and Dr. Turner that Plaintiff could perform a sedentary job. The ALJ said that, as compared to Dr. Smith's August 2018 opinion, these opinions were more consistent with the claimant's treatment history, which "documents several reports of

---

[158] AR 26.

improved symptoms with treatment."[159] However, as explained above, brief periods of relief are not inconsistent with disability.[160] For that reason, the ALJ may not rely on brief periods of documented relief as the only reason to credit an earlier treating opinion over a later treating opinion. On remand, if the ALJ again chooses to credit the June 2018 opinions of Dr. Smith and Dr. Turner over the August 2018 opinion of Dr. Smith, the ALJ must support its decision with legally sufficient reasons and must meaningfully explain what those reasons are.

    4.   <u>Kristina D. Gloria, M.D.</u>

    Dr. Gloria served as Plaintiff's treating physician between June 2015 and February 2018. Plaintiff argues the ALJ harmfully erred by ignoring a treatment note completed by Dr. Gloria in June 2016. That note provided, in part, that, "[Plaintiff] is unable to work due to her pain and will be applying for disability." The Commissioner is correct that a statement by a medical source that a claimant is unable to work is not a medical opinion.[161] However, Plaintiff is correct that here, the ALJ wholly ignored Dr. Gloria.[162] Indeed, the ALJ's decision does not discuss Dr. Gloria even though she treated Plaintiff for more than two years. Having already determined the ALJ harmfully erred and remand is required, the

---

[159] AR 26.

[160] *See Garrison*, 759 F.3d at 1017.

[161] 20 C.F.R. §§ 404.1527, 416.927.

[162] *Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015).

ALJ is instructed on remand to meaningfully consider Dr. Gloria's medical opinions—her statements that reflect her judgments about the nature and severity of Plaintiff's impairments, including Plaintiff's symptoms, diagnoses and prognosis, what Plaintiff can still do despite her impairments, and her physical restrictions—and the relevant evidence that supports those opinions.[163]

## D.    Remand for Further Proceedings

As explained above, the ALJ harmfully erred in rejecting Plaintiff's testimony about her symptoms and their limiting effects. Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[164] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[165]

The Court finds that further development is necessary for a proper disability determination. In particular, the Court lacks Plaintiff's recent medical records. Plaintiff began a new medication in January 2019 for her endometriosis pain.

---

[163] 20 C.F.R. §§ 404.1527(a)(1), (b), 416.927(a)(1), (b).

[164] *Sprague*, 812 F.2d at 1232 (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[165] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

Because Plaintiff's treating physicans were still working to obtain relief for her symptoms, it is possible that relief was obtained after January 2019. However, even if relief was afforded to Plaintiff after January 2019, thereby improving her functional abilities, this does not necessarily foreclose the need for a closed period of disability assessment.

On remand, the ALJ should consider whether testimony should be received from a medical expert pertaining to Plaintiff's endometriosis, adhesions, and urinary disorders. The ALJ shall then reevaluate Plaintiff's symptom reports, reevaluate each of the medical opinions, consider any additional evidence presented, and reevaluate the sequential process beginning at step two.

### V.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 15**, is **GRANTED**.

2.    The Commissioner's Motion for Summary Judgment, **ECF No. 16**, is **DENIED**.

3.    The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

4.    The case shall be **CLOSED**.

///

//

/

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

     **IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and provide copies to all counsel.

     **DATED** this 16th  day of June 2021.


                  s/Edward F. Shea
                   EDWARD F. SHEA
           Senior United States District Judge